UNITED STATES v. EDWIN S. HARTWELL LUMBER CO. SAME v. JOHN SPRY LUMBER CO. JOHN SPRY LUMBER CO. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. October 3, 1905. Rehearing Denied November 8, 1905.)

Nos. 1,124–1,126, 1,555, 1,556.

1. CUSTOMS DUTIES—TIME TO MAKE ENTRY.
    As to merchandise imported before but entered after the tariff act of 1897 became operative, *held* that section 2785, Rev. St. [U. S. Comp. St. 1901, p. 1867], which allows 15 days for the entry of merchandise after the arrival of the vessel transporting it is reported, did not have the effect of permitting entry to be made under the tariff act in force at the time of importation as against the provision in section 33 of said Tariff Act July 27, 1894, c. 11, 30 Stat. 213 [U. S. Comp. St. 1901, p. 1701], that "merchandise previously imported, for which no entry has been made, * * * shall be subjected to the duties imposed by" that act.
    [Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Customs Duties, § 7.]

2. TIME—MEASUREMENT—FRACTIONS OF DAY.
    To the general rule of law that there are no fractions of a day, an exception is made where it is necessary to protect a completed or save a vested right, in which case the interested party may prove time by a shorter measurement.
    [Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Time, § 53.]

3. CUSTOMS DUTIES—TIME OF EFFECT OF TARIFF ACT—"DAY."

Under section 33, Tariff Act July 24, 1897, c. 11, 30 Stat. 213 [U. S. Comp. St. 1901, p. 1701], prescribing that "on and after the day" when the act went into effect the duties provided by the act should be applicable to goods previously imported for which no entry has been made, the word "day" refers to the time or moment when the act took effect; and merchandise imported on that day would not escape the application of the act, unless it was also entered before the act became effective.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Customs Duties, §§ 6, 7.]

4. SAME—ENTRY—PRECEDENT IMPORTATION—TENDER OF ENTRY—RIGHT OF REJECTION.

The whole scheme of tariff laws and the general statutes regulating the collection of duties contemplate that the importation of merchandise shall precede its entry. A collector of customs may properly refuse an entry tendered before the importation is complete.

5. SAME—ACCRUAL—COMPLETION OF IMPORTATION—TENDER OF ENTRY.

The right of the government to duties does not accrue as to merchandise still at sea, even though it has reached American waters and is within a collection district. It attaches only when the vessel carrying the merchandise has reached the end of the voyage and has performed the office of carrier with the intention of delivering the cargo to the consignees.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Customs Duties, § 11.]

6. SAME—TENDER OF ENTRY—FAILURE TO RENEW—CHANGE OF TARIFF ACTS.

As to merchandise imported shortly before the tariff act of 1897 went into effect, the importers tendered entry before the importation was complete. The tender being rejected by the collector, it was not renewed until said act became operative. Held that, under section 33 of said tariff act (Act July 24, 1897, c. 11, 30 Stat. 213 [U. S. Comp. St. 1901, p. 1701]), requiring that merchandise previously imported for which no entry has been made shall be subject to the provisions of that act, the importers' failure to renew, while the old law stood, brought the merchandise within the provisions of said section.

7. SAME—ENTRY—REFUSAL OF TENDER—ESTOPPEL.

Where, at the time of tendering entry of merchandise, there is no existent right on the part of the importers to have it accepted, nor duty on the part of the collector of customs to accept, no estoppel against the government arises through the fact that the collector's refusal may have been on wrong grounds, the statement of which may have misled the importers into failing to renew the tender on the proper occasion.

Appeals and Cross-Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

For decision below, see 128 Fed. 306, which related to a decision of the Board of United States General Appraisers, G. A. 5,365 (T. D. 24,535), which it reversed in regard to importations by the Edwin S. Hartwell Lumber Company, and reversed in part in regard to importations by the John Spry Lumber Company. The board had affirmed in all respects the assessment of duty by the collector of customs at the port of Chicago. The government appealed from the decision of the Circuit Court, as to each importer. The Spry Lumber Company filed a cross-appeal from the decision so far as adverse to them.

Under the tariff law of 1894 lumber was free of duty. By the law of 1897, which became effective by the President's signature at six minutes after 4 o'clock p. m. July 24, 1897, a duty was imposed upon lumber imported from

foreign countries. At Chicago the law went into effect at six minutes after 3 p. m.

On July 23, 1897, the propeller Maine had in tow the barges Pendell, Buckhout, and Exile, and the propeller Toltec had in tow the barge Miztec, all laden with lumber, bound from Canada to Chicago. The lumber on the Maine, Pendell, and Buckhout was consigned to the Hartwell Company, that on the Exile, Toltec, and Miztec to the Spry Company. The consignees tendered entry of the lumber on that day and also during the forenoon of July 24th. The collector refused to accept the tenders.

Prior to 3:06 p. m., July 24th, the Toltec and the Miztec were in American waters and within the collection district of Chicago, but they were still under way and had not arrived at the place outside of the breakwater where it was customary, when the water was sufficiently calm, to break up the tows to be taken in charge by tugs. But the Maine and its barges had reached that point shortly after 2 o'clock and were then lying to and engaged in negotiating with tugs to take them up the Chicago river to the lumber docks. They had some delays in securing tugs and were at the same location at six minutes after 3.

The lumber was entered on July 26th, and the collector demanded and was paid, under protest, duties on all of it at the rates prescribed in the act of 1897. His action was sustained by the board of general appraisers. The Circuit Court affirmed the ruling respecting the lumber on the Toltec and Miztec, consigned to the Spry Company, and overruled it as to the lumber on the Maine, Pendell, and Buckhout, consigned to the Hartwell Company, and on the Exile, consigned to the Spry Company. These appeals and cross-appeal followed.

S. H. Hanchett, for the United States.

Jacob Newman and Chester E. Cleveland, for the importers.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Section 2774 of the Revised Statutes [U. S. Comp. St. 1901, p. 1862] allows the master of a vessel from a foreign country 24 hours within which to report the arrival. Section 2785 [U. S. Comp. St. 1901, p. 1867] gives the consignee 15 days after the report of the master within which to present a written entry of his goods to the collector. From these provisions the importers contend that, the lumber having arrived within the collection district and part of it being "in port" before the new law took effect, they had 15 days in which to make entry, and therefore were entitled to enter the lumber free on the 26th irrespective of the effect of their tenders of entry on the 23d and 24th.

These sections are a part of the general provisions concerning the collection of duties. They apply generally to collections under any tariff law, and no doubt gave these importers 15 days in which to enter duty-free all lumber imported by them while the tariff law of 1894 was in force, unless the tariff law of 1897 cut off that part of the 15 days which extended beyond the time of the taking effect of the new law.

Section 33 of the new law (Act July 24, 1897, c. 11, 30 Stat. 213 [U. S. Comp. St. 1901, p. 1701]), provided:

"That on and after the day when this act shall go into effect all goods, wares and merchandise previously imported, for which no entry has been made,

* * * shall be subjected to the duties imposed by this act and to no other duty * * *."

And the first section began:

"That on and after the passage of this act, there shall be levied," etc.

The argument of the importers is this, briefly: The act became effective on its passage; that is, at 3:06 Chicago time, July 24th. Section 33 requires the prior entry of goods, in order to escape the new duties, only in case of those imported previously to the day on which the act took effect, namely, July 23d, and earlier days. This lumber was imported on July 24th, while the old law was in force. The importers had the right under that law to enter the lumber duty-free, and the general statute giving them 15 days, applied because July 24th was not previous to July 24th, the day on which the new act took effect; and Congress meant this and expressed it deliberately by using the word "day" instead of "time"; because if, after a tariff act has passed both houses, the President should sign the act at 6 p. m., the customs houses closing at 4 p. m., an importer whose goods arrived at 4:10, who would have ample time to make his entry before 6 o'clock, would be deprived of his right of free entry under the then existing law by the mere circumstance that the custom house was closed.

The argument strikes us as being extremely forced and fanciful. What if the President should sign such an act in the forenoon before the custom houses were open? What difference in right or in hardship could Congress have had in mind, on account of which a distinction should be made between goods arriving one minute before and those arriving one minute after midnight preceding the hour and minute the act should be signed?

The general rule of law is that there are no fractions of a day. According to that rule the act of 1897 was in force throughout every one of the 24 hours of July 24th. Congress, according to that general law, neither left nor intended to leave any hiatus of time between the end of July 23d and the minute of July 24th, at which the act was signed. Section 33, by that rule, would require importers, in order to escape the new duties, to have their goods both "imported" and "entered" on or before July 23d. And courts have always acted on that rule whenever the parties have been unable or have omitted to show a narrower punctum temporis for a transaction. But there is an exception to the application of the rule: If it is necessary, in order to protect a completed act or to save a vested right, to prove the time by shorter measurement than days, the interested party may do so if he can. U. S. v. Stoddard, 91 Fed. 1005, 34 C. C. A. 175; U. S. v. Iselin, 95 Fed. 1007, 36 C. C. A. 681; Nunn v. Brewing Co., 99 Fed. 939, 40 C. C. A. 190. Here, these importers, invoking the exception, have been permitted to split up the day and to prove the hour and minute when the act took effect. Having shown that the day when the act took effect was what remained of July 24, 1897, after 3:06 p. m., for one purpose, they should be held to the same day for all purposes of the case.

Further, there is a reason in the history of the wording of section 33 why it is clear that Congress in the act of 1897 intended to adhere to its established policy of requiring all goods "entered" subsequently to the taking effect of a new tariff to be subjected to the payment of the new duties, no matter when "imported." The words of section 33 "on and after the day when this act shall go into effect, all goods * * * previously imported for which no entry has been made * * * shall be subjected * * * " were brought forward from previous tariff acts in which no stress could be laid upon the word "day" and in which "day" had no other significance than "date" or "time." In the McKinley act, for instance, section 50, Act Oct. 1, 1890, c. 1244, 26 Stat. 624, has the above-quoted phraseology of section 33 of the Dingley act. Section 1 provided that "on and after the 6th day of October, 1890, * * * there shall be levied, collected and paid upon all articles imported from foreign countries," etc. In the McKinley act it would be impossible to juggle with the meaning of "day." By using a stereotyped wording in the Dingley act, we think Congress never designed that "day" should have one meaning respecting "importation" and in the same phrase another as applied to "entry." So the question is: Was this lumber both "imported" and "entered" before the act of 1897 became in force?

What was the effect of the tenders of entry on July 23d and in the forenoon of the 24th? An offer to do is deemed equivalent to the act, if the offerer is under an obligation and at the time has the legal right to cancel his obligation and his adversary is under the legal duty to accept performance. In U. S. v. Legg, 105 Fed. 930, 45 C. C. A. 134, it was decided that, after an importation of goods was complete, a tender of entry before the Dingley act went into force was equal to an entry. But it has never been held that a tender of entry of goods not then imported gave the consignee a vested right to be exempt of all duties save those in force when the tender was made. The whole scheme of the tariff laws and the general statutes regulating collections contemplate that "importation" shall precede "entry." The right of the government to duties does not accrue while the goods are at sea, even if the vessel has reached American waters and a collection district. U. S. v. Vowell, 5 Cranch, 368, 3 L. Ed. 128; Arnold v. U. S., 9 Cranch, 104, 3 L. Ed. 671; Meredith v. U. S., 13 Pet. 486, 10 L. Ed. 258; Harrison v. Vose, 9 How. 372, 13 L. Ed. 179. Importation, etymologically the "bringing in" to this country from a foreign country, cannot be complete until the vessel has reached the end of her voyage, has performed her office of carrier or bringer with the intention of delivering her cargo to the consignees. At that moment, for the first time, accrue the right of the government to collect and the duty of the importer to pay. If the importer then tenders entry, it is the duty of the government to accept performance because the importer is under an obligation and at the time has the right to cancel it. But these importers claim it was their right to tender entry and the collector's duty to accept, while the vessels were under way. They were then under no obligation. There was

nothing for them to offer to discharge. There was no debt or obligation for the collector to release. · An importer's obligation and the collector's duty with respect thereto come from the law; and an importer can neither make the law nor create an obligation on the government's part without its consent. As the lumber on the Toltec and the Miztec was not imported until after the Dingley act took effect, there is nothing in the cross-appeal of the Spry Company.

With reference to the lumber on the other vessels, it is claimed that the importation was complete and entry tendered before 3:06 p. m. The docks at which lumber is unloaded are a long way up the Chicago river. The propeller Maine and its three barges in tow, before 3 o'clock were lying to in the harbor outside of the breakwater and were arranging for tugs to tow them to the docks. The vessels having ceased to use their own motive power, had they ended their voyage with a view to discharging their cargoes? Was the breaking up of the tow for the vessels to be taken to the docks by tugs, equivalent to the unlading of cargo upon lighters? Waring v. Mobile, 8 Wall. 110, 19 L. Ed. 342; Gookin v. Ins. Co., 12 Gray, 501, 74 Am. Dec. 609; De Longuemere v. Ins. Co., 10 Johns. 120. Had the consignees the right to make entries before the masters of the vessels had officially reported the arrivals to the collector? The respective counsel have exhibited great industry and learning in the discussion of these questions; but we find it unnecessary to formulate a determinative opinion thereon, because an affirmative answer would not affect the result in these cases. The tenders of entry at various times up to noon of July 24th were ineffectual because importation must precede entry. The record shows that the collector refused to accept the tenders and gave as his reason the fact that the vessels had not reported at the barge office. Conceding for argument's sake, that he gave a bad reason and that the consignees were entitled to make their entries as soon as the vessels had concluded their independent voyages and had cast their lines to the tugs, without waiting for the masters of the vessels to report at the barge office, it is enough to say that the collector was under no duty to give any reason. That is, the consignees were asserting the right to enter their goods while the vessels were at sea. That assertion of right was unwarranted, and the collector's answer in denial thereof (a bad answer being good enough for a bad complaint) cannot excuse the consignees from asserting a different right when, if ever, it accrued to them and the correlative duty on the part of the collector arose. And that is the distinction between the present case and Tacey v. Irwin, 18 Wall. 549, 21 L. Ed. 786, and other like cases, wherein there was an existent right of the property owner, personally or by agent, to pay the tax, and an existent duty of the collector to accept payment when tendered. The consignees in this case were mere volunteers, intruders upon the collector's attention. Having no right to make the entries, they can predicate no right upon the tenders and refusal. Having no business at the collector's office, they cannot create an estoppel against the government out of his remarks any more than if they had accosted him on the street a week or a year in advance of an importa-

tion. To have made a tender that equaled an entry, on the theory most favorable to them they should have presented their papers after the vessels were in and should have based their demand upon that fact. At the hearing in the Circuit Court oral testimony was given that the agents of the lumber companies remained in and about the collector's office until it closed for the day. If this is properly in the record, it is of no avail. After the vessels were lying to, no tender was made nor was the collector advised of the change in conditions which might require him to act.

On the cross-appeal of the Spry Company, the decree is affirmed; on the appeals of the government against the Hartwell Company and the Spry Company, the decrees are reversed with directions to proceed consentaneously hereto.